Law Offices of

# Mann & Risch

A Limited Liability Company

Nathaniel K. Risch
Tyler L. Mann

Allison N. Bush

Tyler@mannrisch.com

101 East Chesapeake Avenue, Suite 100
Towson, Maryland 21286

(410) 929-5145 Main
(410) 625-5809 Fax

www.mannrisch.com

February 10, 2022

*By PACER*
The Honorable James K. Bredar
United States District Court for the District of Maryland
101 W. Lombard Street
Chambers 5B
Baltimore, MD 21201

      RE:   *United States v. Donta Madison*
              Criminal Case No. 0416 1:12CR00037-001

Dear Judge Bredar:

      I write to you on behalf of my client, Mr. Donta Madison, who is to be sentenced on February 11, 2022, at 3:30 pm. Mr. Madison pleaded guilty to Count Four: Possession with Intent to Distribute Fentanyl of 21 U.S.C. § 841 (a)(1) and 21 U.S.C. § 841(b)(1)(C). Mr. Madison has signed a plea agreement in which the parties agree and stipulate, pursuant to Federal Rules of Criminal Procedure 11(c)(1)(B), that a sentence of no greater than 84 months is the appropriate disposition in this case. In anticipation of this month's sentencing hearing, I wanted to provide the Court with some general information about Mr. Madison and this case to ensure that the Court sentence Mr. Madison to the requested 60 months

**Personal History**

      Mr. Madison was born on February 11, 1993, in Baltimore, Maryland to Donta Madison, Sr. and Takeya Miller, who were married at the time. Mr. Madison was not close to his father, who was a substance abuser and who passed away from a drug overdose in 2019.

      Mr. Madison was raised by his mother, with the help of his grandmother, Betty Miller, in Baltimore City. Mr. Madison's mother and grandmother were a big part of his life, and he maintains daily contact with them both. Mr. Madison has three siblings through his mother, namely Nathaniel Thomas, Tapree Bradney, and McKenzie Clark. Mr. Madison also has three siblings through his father, namely Demonte Madison, Shante Madison, and Christian Madison. Mr. Madison does not have a relationship with any of his father's children.

Mr. Madison attended Digital Harbor High School in Baltimore and graduated in June of 2012. After high school, Mr. Madison made two attempts to start classes at the Community College of Baltimore County – Catonsville. Unfortunately, both attempts were unsuccessful.

Mr. Madison has owned and operated two business since 2015. In 2015, Mr. Madison started AKM Motors, which he ran for four years until the business closed due to the impact of the COVID-19 pandemic. After the closing of AKM Motors, Mr. Madison opened Madison Moving and Hauling, LLC which continues to operate to this day. However, due to his incarceration, Mr. Madison does not receive any income from that business and only receives $176.00 per month in unemployment compensation.

Mr. Madison has never been married, but has one child, Aiden Madison, who is 9 years old. Mr. Madison and Aiden's mother, Sydney Johnson are not currently together, but Mr. Madison remains involved in Aiden's life. Mr. Madison also provides financial support for Aiden and Ms. Johnson and continues to effectively co-parent with Ms. Johnson.  This current incarceration is by far the longest Mr. Madison has been away from Aiden, and it is causing him significant heartache.

As a lifelong resident of the Baltimore area, Mr. Madison makes it a priority to be involved in his community. He is well known for giving back to the community and would often participate in community service, food drives, and other community activities.  Mr. Madison has a large social media following, and even took on a role in the HBO movie, Charm City Kings.  Though Mr. Madison has taken great strides in the community, he was also fighting his own personal addiction to drugs.  At the age of 25, Mr. Madison started using Percocet and codeine on a daily basis.  He was also mix codeine with soda to create "lean" a potent medicated drink.  Mr. Madison has never had any substance abuse treatment, and looks forward to receiving some while incarcerated.

At the age of 23, Mr. Madison was diagnosed with metastatic papillary thyroid carcinoma. The exact status of his cancer is currently unknown, as an assessment requires highly complex and specialized imaging and testing, which Mr. Madison has been unable to obtain while incarcerated. Mr. Madison as only been able to receive one PET/CT to check on the status his cancer. Mr. Madison is currently not receiving treatment for his cancer and the planning of future treatment has proved itself to be difficult as obtaining and administering the medications necessary may not be available through the prison system. Mr. Madison's condition will continue to require monitoring by an oncologist.

While incarcerated at CDF, Mr. Madison started seeing Dr. Paz Vellanki, an oncologist at the University of Maryland hospital. Dr. Vellanki has attempted to give the very best care she can to Mr. Madison, but was prohibited in a number of ways.  Though Mr. Madison was mostly asymptomatic, proper care of this type of cancer requires highly specialized imaging and scans to assess the status.  To successfully do the imaging scans, the patient is supposed to follow a strict

schedule of ingestion of radioactive iodine. Mr. Madison was never able to complete these scans because of missed visits and scheduling issues at CDF. Despite these issues, Dr. Vellanki identified a medication treatment plan using larotrectinib, and FDA approved *NTRK* inhibitor. This medication will target the genome that most likely drives the growth of the cancer. This medication is expensive and the United States Marshal's have delayed ordering the medication for Mr. Madison. One explanation given by the Marshal's is Mr. Madison will soon be in the care of the Bureau of Prisons. While this is certainly true, and Mr. Madison appreciates an expedited designation to Butner, North Carolina, this delay has caused undo stress on him and his family.

Mr. Madison also suffers from diabetes. He has a BMI of 29, putting him at the top of the "overweight" category. He is prescribed insulin, but reports that he does not always receive it when necessary at CDF. The CDC has identified diabetes as a condition that places individuals at "high risk for severe illness from COVID-19." In its June 15, 2020 report, the CDC identified diabetes among the most common preexisting condition resulting in hospitalizations and deaths.[1] The American Diabetes Association has likewise warned that people with diabetes face "a higher chance of experiencing serious complications from COVID-19."[2]

**Criminal History**

The Presentence Investigation Report classifies Mr. Madison as a criminal history category I, with a score of one. He has only one prior conviction from 2012, when he was 19 years old, with only one violation of probation. While Mr. Madison has a few other arrests in his past, he has no prior drugs or weapons related convictions.

**Nature and Circumstance of the Offence**

Mr. Madison accepts full responsibility for his actions in this indictment. In regard to this indictment, it is somewhat hard to balance the steps that Mr. Madison took to be a legitimate business man, entrepreneur, and leader in the Park Heights community with the extent of the drug operation being run in the same community. Mr. Madison grew up in the Northwest district, and grew up with the individuals in his indictment. When law enforcement first started to investigate the drug "shop" located on Queensbury and Spaulding it was run by an individual who went by "Baby Frank". Frank was Mr. Madison's best friend, dating back to elementary school. Frank was shot and killed on June 17, 2020, a murder which still goes unsolved. After he was killed, Mr. Madison stepped into a leadership role. This was not something that Mr. Madison strived to do, but was drawn by the quick money. From June 2020 until his arrest in February 2021, Mr. Madison was involved in selling fentanyl on a retail and wholesale level. Mr. Madison is

---

[1] https://www.cdc.gov/mmwr/volumes/69/wr/mm6924e2.htm
[2] https://www.diabetes.org/coronavirus-covid-19/how-coronavirus-impacts-people-with-diabetes

embarrassed to carry the label of felon for the rest of his life after all he has done for the community.

## COVID-19

Keeping individuals incarcerated in facilities where the COVID-19 virus is running rampant is a violation of the inmates' 8th amendment protections against cruel and unusual punishment. The 8th amendment of the United States Constitution states that cruel and unusual punishments shall not be inflicted. USCS Const. Amend. 8. "The Amendment also imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984)). "The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial 'risk of serious damage to his future health…'" *Id*. at 843 (quoting *Helling v, MicKinney*, 509 U.S. 25, 35 (1993)). To show "substantial risk" the inmate must be able to show that "he is incarcerated under conditions posing substantial risk of serious harm." *Id*. Deliberate indifference must be more than mere negligence but can be satisfied by "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 836.

While an "accidental or inadvertent failure to provide adequate medical care to a prisoner would not violate the Eighth Amendment, 'deliberate indifference to serious medical needs of prisoners' violated the amendment because it constitutes the unnecessary and wanton infliction of pain contrary to contemporary standard of decency." *Helling*, 509 U.S. at 32 (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

COVID-19 pandemic in jails and prisons has caused and is continuing to cause terrible living conditions for the inmates. The densely populated facilities and close living quarters makes it difficult, if not impossible, to follow safety precautions to stop the spread of the virus among inmates. Being confined to these dormitory style living spaces where social distancing is not possible only facilitates the rapid spread of an already quickly spreading deadly disease. Keeping inmates in such close quarters puts the inmates in harm's way, especially inmates who are elderly and/or inmates who have compromised immune systems. Being forced to live in these conditions where adequate medical care may not be available and where the rapid spread of the virus from inmate to inmate and correctional officer to inmate, constitutes a serious risk to the future health of the inmates.

The conditions in which inmates are living and the constant risk of being exposed to the virus has created dangerous and deadly conditions for the inmates and serious risks to their future

health that constitutes a violation of the inmates' 8th amendment protections against cruel and unusual punishment.

### Downward Variance from Federal Sentencing Guidelines or a 2-Point Reduction in Federal Sentencing Guidelines

The impact that the COVID-19 pandemic has had on correction facilities and the inmates incarcerated in these facilities constitutes a mitigating circumstance not taken into consideration when sentencing guidelines were originally formulated and therefore warrants individualized sentences, varying downward from the original guidelines.

18 USCS § 3553 (a) defines the factors to be considered by the Federal Courts when imposing a sentence and includes such factors as the nature and circumstance of the offense, history of the defendant, the need for the sentence, the sentencing ranges established, and more.

18 USCS § 3553 (b)(1) provides some guidance for the application of the sentencing guidelines when imposing a sentence and states, in pertinent part:
> "Except as provided in paragraph (2), the court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described."

28 USCS § 991 (b)(1)(B) states that the purpose of the United Stated Sentencing Commission is to:
> "provide certainty and fairness in meeting the purposes of sentencing, avoiding unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct while maintaining sufficient flexibility to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices …"

This reference to taking into account mitigating or aggravating circumstances not initially considered in the making of the guidelines that warrant individualized sentences found in both sections shows the importance of the individualized sentence when certain circumstances, such as the unprecedented circumstances of the COVID-19 pandemic, are occurring that were not considered when creating the sentencing guidelines.

Because the factors taken into consideration under § 3553 (a) do not include unprecedented or extraordinary circumstances such as those being experienced due to the COVID-19 pandemic, § 3553 (b)(1) becomes even more important.

Due to the fact that there was no way the circumstances surrounding the COVID-19 pandemic could have been considered when originally creating sentencing guidelines, the current circumstances should be considered a mitigating factor not taken into account when creating the guidelines and therefore warrant individualized sentences, differing from the guidelines, taking into consideration the effect of the COVID-19 pandemic.

**Conclusion**

Mr. Madison respectfully submits that a sentence of 60 months is the appropriate sentence for this particular offense. He acknowledges that he made a series of grave and poor decisions that will affect him and his family for the rest of his life. However, Mr. Madison is not a violent or dangerous person. He is not someone who the public must be protected from by way of a lengthy prison sentence.

Mr. Madison will stand before the court on February 11th and accept responsibility for his actions. He will also be supported by his family who may be called upon to speak to his character. Mr. Madison's actions in the crimes laid out in this indictment are not an accurate portrayal of who is really is.

Mr. Madison offers this information not as an excuse, but simply as an explanation for his behavior. The Defense respectfully submits to the Court that the proposed sentence of 24 months is the appropriate disposition in this case. It is sufficient but no longer than necessary to further the sentencing goals of 3553 (a). We appreciate the Court's time and patience in reading this letter.

                Very truly yours,

                Mann & Risch, LLC

                By: _/s/ Tyler Mann_
                     Tyler Mann

Enc.

CC: AUSA Clinton Fuchs (by electronic mail)